UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
AHMED MOHAMED,

                              Plaintiff,                    10 Civ. 7249 (PKC)

          -against-

                                                           MEMORANDUM
                                                           AND ORDER

METROPOLITAN LIFE INSURANCE
COMPANY,

                              Defendant.
------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

            Plaintiff Ahmed Mohamed seeks judicial review of a final decision by defendant

Metropolitan Life Insurance Company ("MetLife") denying his application for long-term

disability benefits.  The Employee Retirement Income Security Act of 1974 ("ERISA") gives

district courts original jurisdiction over actions to recover insurance benefits under a policy

issued as part of an employee welfare benefit plan.  29 U.S.C. §§ 1132(a)(1)(B), (e)(1).

Defendant seeks equitable restitution for income plaintiff received during the benefits period

under section 502(a)(3) of ERISA.  29 U.S.C. §§ 1132(a)(3).  Both parties have moved for

summary judgment based on the administrative record.  For the reasons discussed below,

plaintiff's motion is granted and defendant's motion is denied.  The matter will be remanded to

MetLife, the plan administrator, to consider additional evidence.  Defendant has also moved for

summary judgment to recover overpayments made to the plaintiff.  That motion is granted.

BACKGROUND

I.      Procedural History

In March 2007, Mohamed was employed as an Assistant Vice President in

Application Architecture and Development at Credit Suisse First Boston ("Credit Suisse").  (145,

436)[1]  Mohamed's job consisted of computer programming that required him to sit and type at a

computer for five to eight hours a day.  (852)  As an employee, he was eligible for and enrolled

in Credit Suisse's group short-term and long-term disability plans, which are administered by

MetLife.  (63-108)  MetLife also funds the long-term disability plan.  Mohamed's last day of

work was March 8, 2007.  (145)  In March 2007, Mohamed applied for and began receiving

short-term disability benefits.  (113-116, 860)  He received these benefits for the maximum six-

month period before applying for and receiving long-term disability benefits for an additional

year and three months.  (153, 615, 842)  The plans use the same definition of disability which is:

> due to sickness, pregnancy or accidental injury, you are receiving Appropriate
> Care and Treatment from a Doctor on a continuous basis and you are unable to
> earn more than 80% of your Predisability Earnings or Indexed Predisability
> Earnings at your Own Occupation for any employer in your Local Economy.
> (319)

On or about December 8, 2008, MetLife informed Mohamed that his long-term

disability benefits would be terminated as of that date because an independent medical examiner

found that he had the functional ability to perform his own job.  (617)  Mohamed appealed the

decision, and MetLife upheld the termination of his long-term disability benefits on or about

June 3, 2009.  (296-299)  Mohamed filed this action against MetLife on September 21, 2010

seeking to recover long-term disability benefits allegedly due to him under Credit Suisse's plan.

---

[1] All references are to the Bates stamped documents submitted by the defendant.

II.    <u>Medical History</u>

    a.    <u>Prior to Short-Term Disability Benefits</u>

Mohamed was thirty-nine years old on his last day of work in March 2007.  (843)

He had complained of neck and back pain as well as numbness and weakness in his hands since

early 2006, but x-rays taken at that time were negative.  Although Mohamed tried various

workplace accommodations to make working more comfortable, they did not sufficiently reduce

his pain.  (112-116)  A January 25, 2007 magnetic resonance image ("MRI") of Mohamed's

cervical spine showed disc herniation and canal stenosis.  (881)  A February 7, 2007 MRI of

Mohamed's lumbar spine showed scoliosis, disc herniation and other conditions. (879-880) A

March 12, 2007 electromyography exam ("EMG"), which detects the electrical potential

produced by muscle cells, showed mild carpal tunnel syndrome in Mohamed's right hand and

cervical radiculopathy, commonly known as a pinched nerve.  (868, 875-876)  Dr. Ali E. Guy

treated Mohamed for multiple injuries during this time and expected that his impairments would

last for six months.  (865)  These treatments included trigger point injections, physical therapy,

chiropractic care, and pain medication.  (843)  After internally evaluating Mohamed's medical

information and concluding that he could not safely perform his job duties, on March 23, 2007,

MetLife approved short-term disability benefits lasting for approximately one month.  (116, 860)

    b.    <u>During Short-Term Disability Benefits</u>

Mohamed flew to Cairo, Egypt, where his parents live, on April 17, 2007.  (117,

140-141, 852)  When, two weeks earlier, he informed MetLife of his plans to travel, MetLife

contacted Dr. Guy to ask about Mohamed's ability to fly to and continue treatment in Egypt.

(119)  Dr. Guy does not appear to have responded to this inquiry.   (MetLife Mem. at 6)

Mohamed continued to complain of back and neck pain as well as weakness and numbness in his

right hand that were exacerbated by sitting at a desk and typing.  (852)  On April 28, 2007, Dr.

Mohamed Ismail examined Mohamed and the earlier MRIs and EMG.  (851)  As the result of his

clinical examination, Dr. Ismail concluded that Mohamed had injuries to the cervical and lumbar

regions of his spine, suffered from arthritis and carpal tunnel syndrome and had a limited range

of motion and noticeable weakness in his right arm.  (851)

   During the first week of May, MetLife conducted a second internal evaluation of

Mohamed's medical information and approved a one-month continuation of short-term disability

benefits because Mohamed was unable to sit and type for eight or more hours and was at risk for

increased pain, nerve damage, or loss of function.  (130-131, 850)  The nurse who conducted the

evaluation suggested a twelve-week recovery period and concluded that Mohamed's condition

was too severe for vocational rehabilitation.  (130-131)  Mohamed saw Dr. Ismail again on May

26, 2007 and was told to continue physical therapy and pain medication.  (848)  MetLife

extended short-term disability benefits by one month on July 5, 2007.  (845)

   During a third visit on August 1, 2007, Dr. Ismail found that Mohamed's arthritis

and range of motion limitations continued and that his carpal tunnel condition and neck and back

pain had worsened.  Dr. Ismail prescribed pain medication.  (843)  On August 16, 2007, MetLife

conducted a third internal evaluation of Mohamed's medical information and extended short-

term disability benefits to September 6, 2007, exhausting the maximum period allowed under the

short-term disability plan.  (147, 842)  MetLife concluded that Mohamed's hand, wrist, shoulder,

neck and back pain made him unable to perform his job duties.  (147)  Mohamed's claim was

then referred to long-term disability claim management.  (842)  On September 6, 2007, a

MetLife "claims specialist" reviewed Mohamed's medical information and approved long-term

disability benefits through October 31, 2007, noting that diagnostic testing supported the severity of impairment found.  (153)

            c.  <u>During Long-Term Disability Benefits</u>

In an exam conducted in early September, Dr. Guy found that Mohamed still suffered from disc herniations, carpal tunnel syndrome, cervical radiculopathy and traumatic myofascial pain syndrome and had limitations in his range of motion.  (825)  He described Mohamed as "totally disabled temporarily" and suggested additional physical therapy.  MetLife approved a continuation of long-term disability benefits through December 7, 2007 after a claims specialist reviewed Mohamed's medical information and concluded that it supported the severity of impairment found by Dr. Guy.  (172, 764)

During a November 14, 2007 visit, Dr. Guy conducted a second EMG which showed lumbar radiculopathy in addition to Mohamed's other diagnoses, which persisted.  (756-757)  Dr. Guy prescribed additional physical therapy, trigger point injections and paraspinal injections.  (758)  Dr. Guy also opined that Mohamed could only sit, stand and walk for one hour, intermittently rather than continuously, and could only perform repetitive finger movements with pain requiring him to take frequent breaks.  (752-753)  Dr. Guy expressed concern that returning to work would lead to further deterioration of Mohamed's condition and that the chances of improvement were low since physical therapy had not led to any functional improvement.  (753)  After internal review by a claims specialist, MetLife extended long-term disability benefits until December 28, 2007 and then again until March 6, 2008.  (177, 742, 749)

In response to a June 2008 request from MetLife for up-to-date medical records, Mohamed submitted office notes from Dr. Guy corresponding to visits on March 12, 2008, March 30, 3008, April 23, 2008 and June 2008.  (695-702)  He also submitted a June 2, 2008

addendum to Dr. Guy's September report stating that Mohamed's diagnoses were permanent. (695-702)  Dr. Guy's April notes state that Mohamed could tolerate one hour of continuous sitting, standing or walking and could climb, twist, drive and reach overhead.  Mohamed also submitted office notes from Dr. Ismail from a March 30, 2008 visit. (695-702)  Mohamed also stated that he was taking Celebrex and Soma for pain treatment.  (695)  In June 2008, Mohamed still reported pain in his hands, shoulders and back and expressed concern that overuse would cause additional damage.  (192)  He also expressed concern that his pain medication would his cognitive ability to do his job.  (194)

On June 20, 2008, Mohamed's claim was referred to Dr. Monkofsky, MetLife's Medical Director, who did not think that the medical information showed that Mohamed was totally and permanently disabled.  (193-195)  On June 23, 2008, Mohamed's long-term disability benefits were extended because "it was determined that [his] medical condition [was] still of a severity to warrant a continuation of benefits." (694)  However, MetLife planned to conduct additional review and clarification of Mohamed's medical condition and to ask him about his ability to fly to Egypt despite being disabled. (198)  On June 27, 2008, Mohamed was informed that he needed to have a medical doctor prove that Mohamed's capabilities were sub-sedentary and that he was totally disabled, but MetLife did not specify whether he needed to have additional tests done to support his claim when Mohamed asked.  (199)  Dr. Guy's office notes from July 9, 2008 show that Mohamed still suffered from neck and back pain and had a limited range of motion.  (201, 600)  Dr. Guy concluded that the patient was permanently and totally disabled and that the condition was not curable.  (201, 600)  He also warned that the condition could rapidly and progressively deteriorate if he returns to work.  (201, 600)

MetLife sought an "independent physician consultation" of Mohamed's medical information from Dr. Richard S. Kaplan, who was retained by MetLife through the Medical Consultant Network.  (201, 682-686)  Dr. Kaplan concluded that Mohamed's information did not support any functional limitations because the record only documented subjective symptoms and not objective findings.  (685)  He also thought that both MRIs were inconsistent with Mohamed's physical examinations conducted by other doctors and noted that the EMG findings were illegible and could not be used to verify Mohamed's diagnoses.  (684-685)  Dr. Kaplan also phoned Dr. Guy to discuss Mohamed's records.  (684)  Dr. Kaplan did not conduct his own physical examination of Mohamed.  Dr. Kaplan concluded that Mohamed's disability was induced by medical treatment or diagnostic procedures and that an independent medical examination should be done.  (686)

Dr. Kausnik Das reviewed Mohamed's medical information and conducted a physical examination which showed paraspinal muscle spasms, disc herniations, weakness and decreased range of motion. Dr. Das concluded that Mohamed was permanently and totally disabled and that his condition was progressive.  (209-210, 658-659)  He also found that Mohamed experienced severe symptoms after only 5-10 minutes of sitting at a computer and could not push more than 5-10 pounds.  (209-210, 658-659)  He recommended trigger point injections, pain medication, and heat to treat his symptoms.  (209-210, 658-659)

An independent medical examination was conducted by Dr. Amy Weiss-Citrome on October 29, 2008 who reviewed Mohamed's medical information and Dr. Kaplan's review of that information.  (633-636)  Mohamed complained of neck, back, chest, and leg pain in addition to weakness and numbness in his arms and legs.  (633-636)  Dr. Weiss-Citrome found pain and crepitus in the cervical and lumbar spine, limited range of motion in the neck, paraspinal muscle

spasms and diminished sensation in the second and third fingers.  (635)  She diagnosed

Mohamed with mild right carpal tunnel syndrome, cervical radiculopathy, and lumbar herniated

nucleated pulposus.  (635)  However, Dr. Weiss-Citrome did not believe that the functional

limitations found by "[Mohamed's] physician" were clinically supported.  (636)  She believed

that Mohamed was only restricted from lifting more than twenty-five pounds and frequent

bending.  (636)  Dr. Weiss-Citrome did not expect Mohamed's condition to improve with

ongoing treatment given its duration.  (636)

        Based on Dr. Weiss-Citrome's examination, a MetLife claims specialist

determined that Mohamed had the functional ability to perform his own job.  (617)  A December

8, 2008 letter terminating benefits cited a lack of clinical evidence and diagnostic testing results

supporting a functional impairment.  (616-618)  Dr. Kaplan's evaluation was not cited in support

of the denial of benefits.  In an updated report from December 12, 2008, Dr. Guy stated that

Mohamed still had neck and back pain and that working at a computer for more than a half hour

caused his muscles to tense up severely.  (612-613)  Dr. Guy also stated that Mohamed's pain

medications, including Tylenol with Codeine, caused drowsiness and "alterations" to normal

cognitive function.  (612-613)  Having read Dr. Weiss-Citrome's report, Dr. Guy stated that

Mohamed still could not return to any type of gainful employment, could not sit or stand on a

continuous basis for more than a half hour and that Dr. Weiss-Citrome had overlooked the effect

pain medication was having on Mohamed's cognitive abilities.  (612-613)  In an expanded denial

letter dated January 9, 2009, MetLife decided to proceed with the claim closure since Dr. Guy's

updated report did not provide any additional objective findings.  (226)

d.  <u>During Appeal</u>

An updated report from Dr. Guy dated January 7, 2009, stated that Mohamed had tenderness, spasms and a limited range of motion in his neck and back and that the power in his right hand and leg was slightly below the normal range.  (540-542)  Dr. Guy found that standing caused Mohamed's back and buttocks to cramp, that he could lift 5-10 pounds occasionally and that repetitive hand motions caused his right hand to cramp after two minutes.  (540-542)  Dr. Guy diagnosed Mohamed with disc herniations, canal stenosis, disc bulge, right carpal tunnel syndrome, cervical radiulopathy and myofascial pain syndrome.  (540-542)  He concluded that Mohamed was totally disabled because he could not sit or stand continuously or use a keyboard. (540-542)  He also stated that the pain medication Mohamed was taking made him drowsy and altered his normal cognitive function such that he could not imagine any employer who would be willing to hire him.  (540-542)

Dr. Balbaa, Ph.D., wrote a physical therapy report dated February 16, 2009, which concluded that Mohamed's condition was chronic and that no further improvement was expected.  (558-560)  Specifically, Mohamed's condition did not allow him to stand or sit for more than 20-30 minutes continuously.  (558-560)  Dr. Balbaa's opinion was based on deficiencies shown during muscle testing as well as positive cervical compression and vertebra-basilar insufficiency tests.  (558-560)

In a physical medicine and rehabilitation report dated February 19, 2009, Dr. Youssef stated that Mohamed's neck and back had tender points and limited ranges of motion. (563-566)  He also noted that a Spurling Test was positive on the right side.  A Phalen Test, Reverse Phalen Test, Compression Test, Tinel's Test, Hawkins Test, Faber's Test, Straight leg Raising Test and Open Book Test were also positive.  (563-566)  Dr. Youssef also noted

decreased sensation in Mohamed's back and lower extreminities.  (563-566)  He diagnosed

Mohamed with cervical radiculopathy, myofascial pain syndrome, shoulder impingement

syndrome, ulnar impingement at the elbow, carpal tunnel, disc prolapsed, lumbar radiculopathy,

gait abnormality and neuropathic pain.  (563-566)  He prescribed physical and occupation

therapy and Neurontin to treat nerve pain.  (563-566)  He concluded that Mohamed was totally

and permanently disabled because he lacked the ability or stand continuously and because his

pain medication interfered with his ability to stay alert and attentive.  (563-566)  Dr. Youssef

recommended a functional capacity evaluation to confirm the clinical findings. (563-566)

       Dr. Ibrahim, Ph.D., conducted a functional capacity evaluation on March 1, 2009.

(558-560)  Mohamed tested positive during a variety of orthopedic tests including Addison

Maneuver, Cervical Distraction Test, Kemp's Test, Lasegue's Straight Leg Raise Test,

Maximum Cervical Compression Test, Shoulder Depressive Test and Valsalva Maneuver.  (558-

560)  He could occasionally lift and frequently carry five to ten pounds and could work in a static

position for five to ten minutes.  (558-560)  He could also reach overhead once or twice and

could bend for up to three repetitions.  (558-560)  Dr. Ibrahim believed that Mohamed exerted

maximum effort within his tolerance for the evaluation.  (558-560)

       On April 8, 2009, Dr. Gordon submitted his review, as requested by MetLife, of

Mohamed's medical file.  (456-466)  Dr. Gordon noted that although all of the people who had

reviewed Mohamed's file had found deficits, there was disagreement as to the degree of the

deficits.  (456-466)  He also noted that Mohamed's flying to Egypt was inconsistent with the

finding that he could not sit continuously for extended periods of time and had impaired

cognitive abilities.  (459)  He also found that the evidence of Mohamed's diagnoses exceeded

what one would expect based on "the level of demonstrated abnormality." (459)  Specifically,

he thought Dr. Balbaa's rating of Mohamed's hand strength was impossible and that Dr. Ibrahim's report used boilerplate language that made it difficult to evaluate his methods and conclusions.  (456-466)  Dr. Gordon agreed with Dr. Weiss-Citrome's assessment of Mohamed's restrictions and limitations.  (459)

Dr. Guy submitted an updated report based on an April 27, 2009 examination and new EMG of the lower extremities.  (415-423)  The physical examination of Mohamed's neck and back showed spasms, multiple trigger points and limited ranges of motion.  (415)  The EMG showed lower back radiculopathy.  (416)  Dr. Guy again concluded that Mohamed was totally disabled and that his disability was caused by overuse from prolonged sitting and working on a computer.  (416)  He also stated that his condition could get worse if he continued those activities and that he was not able to sit or stand on a continuous basis.  (416)  He recommended physical therapy and trigger point injections.  (416)

After reviewing this report, Dr. Gordon stated that the new EMG was compatible with lower back radiculopathy but that Mohamed's restrictions and limitations were not incompatible with sedentary work and most light work.  (401-402)  In a June 3, 2009 letter, MetLife upheld its decision to deny further long-term disability benefits.  (296-299)  Based on Dr. Gordon's evaluation, MetLife concluded that the medical records did not support functional impairment, restrictions or limitations that prevented Mohamed from working his own job. (296-299)  In a subsequent letter explaining its decision, MetLife stated that Dr. Gordon recognized that Mohamed's impairments may be considerable but still thought they were compatible with "some work."  (280-281)

DISCUSSION

      I.     <u>Summary Judgment Standard</u>

      Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56, Fed. R. Civ. P.  It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, sufficient to demonstrate that he or she is entitled to relief as a matter of law.  <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 244 (2d Cir. 2004).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'"  <u>Powell v. Nat'l Bd. of Med. Exam'rs</u>, 364 F.3d 79, 84 (2d Cir. 2004) (quoting <u>Aslanidis v. U.S. Lines, Inc.</u>, 7 F.3d 1067, 1072 (2d Cir. 1993)).

      A fact is material if it "might affect the outcome of the suit under the governing law," meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, granting summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party.  <u>Costello v. City of Burlington</u>, 632 F.3d 41, 45 (2d Cir. 2011); <u>accord</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585–88 (1986). In reviewing a motion for summary judgment, the court may scrutinize the record, and grant or deny summary judgment as the record warrants.  Rule 56(c)(3), Fed. R. Civ. P.  In the absence of any disputed material fact, summary judgment is appropriate.  Rule 56(a), Fed. R. Civ. P.

"A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (internal citation omitted); see also Anderson, 477 U.S. at 249–50 (summary judgment may be granted if the opposing evidence is "merely colorable" or "not significantly probative") (citations omitted).  An opposing party's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." Contemporary Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 n. 14 (2d Cir. 1981) (quotation marks omitted).  These standards apply equally where the parties have filed cross-motions for summary judgment. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

II.    ERISA Standard

"A denial of benefits challenged under [ERISA] must be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  However, where the claim administrator has discretionary authority, the court "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" Hobson v. Metropolitan Life Co., 574 F.3d 75, 82 (2d Cir. 2009) quoting Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995).

Under this deferential standard, the decision to deny benefits can only be overturned if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Pagan, 52 F.3d at 442.  "Substantial evidence . . . is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . .

13

requires more than a scintilla but less than a preponderance" of evidence.  Miller v. United Welfare Fun, 72 F.3d 1066, 1072 (2d Cir. 1995) (internal citations and quotation marks omitted).  In evaluating the decision to deny benefits, the Court must only consider evidence contained in the administrative record.  Miller, 72 F.3d at 1071.   "If upon review a district court concludes that the [administrator's] decision was arbitrary and capricious, it must remand to the [administrator] with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.'"  Id.

III.    Plaintiff's Claim to Recover Long-Term Disability Benefits

After a year and nine months of approving Mohamed's disability claims, MetLife terminated his benefits even though there had not been any significant change in Mohamed's condition as indicated in his medical records.  MetLife decided to review Mohamed's claim in June 2008 because up-to-date medical records had not been submitted since November 2007 and were needed to determine whether Mohamed continued to be disabled.  MetLife asserts that its decision to discontinue long-term disability benefits was supported by substantial evidence consisting of Dr. Kaplan, Dr. Weiss-Citrome and Dr. Gordon's reviews of the medical record, Dr. Weiss-Citrome's examination of Mohamed and the lack of clinical evidence and diagnostic testing results to support his disability. Under the circumstances of this case, this evidence is insufficient to meet the low threshold imposed by an arbitrary and capricious standard.

Dr. Kaplan and Dr. Gordon's opinions are based solely on the medical records as they did not have an opportunity to conduct a physical examination of Mohamed.  Both doctors concluded that his medical record at the time of review did not contain enough up-to-date information to provide conclusive support that Mohamed continued to be disabled.  However,

this is not the same as determining that Mohamed's existing records did not provide evidence of a chronic disability, which is what MetLife implies in its brief. Moreover, the conclusions of these two doctors were at least partially founded on improper considerations and a lack of diagnostic testing for which MetLife itself is partially to blame.

Specifically, Dr. Kaplan's conclusion that the record supported <u>no</u> functional limitations was partially based on a decision not to credit Mohamed's subjective complaints of pain and an inability to assess the diagnostic tests that had been submitted because they were illegible. MetLife was not warranted in attributing significant weight to Dr. Kaplan's opinion. The Second Circuit has stated that "the subjective element of pain is an important factor to be considered in determining disability." <u>Connors v. Conn. Gen. Life Ins. Co.</u>, 272 F.3d 127, 136 (2d Cir. 2001). MetLife does not state that Mohamed's subjective complaints lacked credibility or point to any evidentiary basis for that conclusion in the record but points to Dr. Kaplan's opinion as substantial evidence for their decision. Additionally, a decision to deny benefits based on the illegibility of the records submitted is without reason. Only Dr. Kaplan's assessment that Mohamed's MRIs were inconsistent with the physical examinations conducted by other physicians could be credited by MetLife to deny his claim.

Similarly, Dr. Gordon improperly concluded that Mohamed's ability to navigate and endure a transatlantic flight was inconsistent with Mohamed's claims that his cognitive abilities were altered by his pain medication and that he could not sit for extended periods of time. Dr. Gordon does not explain how these facts bear on Mohamed's ability to perform his own job duties. Moreover, Dr. Gordon's conclusion was based on the assumption that Mohamed did not get up from his seat during his flight and did not take the maximum dosages of pain medication prescribed. Although Mohamed's ability to sit through a multi-hour flight a few

times a year is a relevant consideration, it does not show that Mohamed was capable of sitting, programming and typing for up to eight hours a day, five days a week.  The situations are different in kind but to the extent they are similar, they are also different in degree.  Additionally, many people are able to navigate international travel while on sedatives or anti-anxiety medication that would impair their job performance.

Dr. Gordon also unjustifiably discounted Dr. Ibrahim's report on Mohamed because it contained superfluous information, which Dr. Gordon refers to as "boilerplate," about the tests conducted on examination.  Although this may have made Dr. Ibrahim's reports more difficult to evaluate, dismissing all of the information contained in them for this reason was improper.  To the extent that Dr. Gordon's opinion was based on these considerations, his opinion cannot be viewed as substantial evidence for MetLife's decision.  Only Dr. Gordon's assessments that the medical record was inconsistent as to the degree of Mohamed's disability and that his diagnoses overstated his condition could be credited by MetLife to deny his claim.

MetLife also relied on the opinion of Dr. Weiss-Citrome, who conducted a physical examination of Mohamed and concluded that he was restricted from lifting more than twenty-five pounds and frequent bending.  Dr. Weiss-Citrome's opinion does not appear to be based on any improper considerations, and MetLife properly relied on it to deny long-term disability benefits.  However, on its own, Dr. Weiss-Citrome's opinion does not amount to substantial evidence, especially in light of the other evidence supplied by Mohamed.  Dr. Weiss-Citrome's opinion even confirms some of the diagnoses and findings made by Mohamed's doctors, and she agreed that his condition was unlikely to improve, even though she disagreed with his doctors on his specific restrictions.  She also did not reach a conclusion on the effects Mohamed's pain medication may have been having on his cognitive abilities.

Mohamed submitted evidence of his conditions from six different examiners and two functional capacity evaluations. All of these examiners were unanimous about Mohamed's diagnoses and the progressive nature of his condition, but they disagreed on the degree of his disability. Dr. Gordon and Dr. Weiss-Citrome also made similar diagnoses except that they found these diagnoses significantly less severe and restrictive than Mohamed's doctors. MetLife did not conduct its own functional capacity evaluation and did not request a description of Mohamed's job duties from Credit Suisse until the appeal phase, four months after its initial denial of Mohamed's claim. MetLife is not required to conduct a functional capacity evaluation in order to deny a claim, but such an evaluation could have been helpful in showing that there was substantial evidence for MetLife's decision. And while MetLife appears to have had all of the information necessary to make a decision on appeal, the absence of a job description prior to initial denial raises questions about whether Mohamed's claim was fairly and adequately reviewed.

MetLife's doctors all focus their evaluations on whether Mohamed's disability is total and permanent. Presumably, these evaluations were in response to the opinions of Mohamed's own doctors who described his condition as a total and permanent disability. However, that question is irrelevant to MetLife's determination of Mohamed's claim. Under the terms of the plan, MetLife is to review a claim for long-term disability benefits on a monthly basis. Whether or not Mohamed's condition was found to be a total and permanent disability at that time did not change MetLife's future rights to request updated medical records in order to continue providing benefits. Similarly, MetLife did not specify which additional tests, if any, Mohamed needed to have done when it requested updated records and then denied Mohamed's claim because there was a lack of up-to-date clinical evidence and diagnostic testing. This

17

occurred even though Mohamed specifically asked what he would need to do in order to provide evidence for his claim.  After being informed of the basis of his denial, Mohamed corrected the problem by submitting physical test results and an updated EMG, which Dr. Gordon agreed provided support for Mohamed's diagnoses, but MetLife concluded that Mohamed was capable of performing his job on the basis of its doctors' evaluations.

This Court's review of the administrative record in its totality and concludes that that MetLife's determination was not supported by substantial evidence.

     IV.    <u>Defendant's Counterclaim to Recover Overpayment</u>

Plaintiff concedes that MetLife is entitled to recover $6,331.07 for overpaid benefits under ERISA 502(a)(3), 29 U.S.C. 1132(a)(3).  (Mohamend Opp. at 16; 426)  This overpayment occurred because Mohamed received retroactive worker's compensation benefits that overlapped with his receipt of disability benefits from MetLife and would have counted as "Other Income Benefits" under his policy with MetLife.  (23, 25, 568, 616, 640, 707, 799)  On August 30, 2007, Mohamed also signed a Reimbursement Agreement requiring him to repay any overpayment in benefits that resulted from the receipt of worker's compensation benefits.  (820)  MetLife's motion for summary judgment on its counterclaim is granted.

CONCLUSION

Plaintiff's motion for judgment on summary trial based on the administrative record is GRANTED.  (Docket #22)  The case is remanded to MetLife to consider the entirety of the evidence in light of this Court's Memorandum and Order.  Defendant's motion for summary judgment based on the administrative record is DENIED but is granted in defendant's favor on its claim to recover overpayments made to the plaintiff in the amount of $ 6,331.07.  (Docket # 15)

The Clerk is directed to enter judgment in accordance with the foregoing.  The case is closed.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       February 2, 2012